Matthew M. Clarke, State Bar No. 184959
Dugan P. Kelley, State Bar No. 207347
Matthew N. Mong, State Bar No. 273337
CHRISTMAN, KELLEY & CLARKE, PC
1334 Anacapa Street
Santa Barbara, CA 93101
Telephone: (805) 884-9922
Facsimile: (866) 611-9852

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nelson Deedle, an individual; and Iconographs, Inc., a Nevada Corporation, <br><br>         Plaintiffs, <br><br> vs. <br><br> Collectors Universe, Inc., a Delaware Corporation, doing business as PSA/DNA; James Spence Authentication LLC, a New Jersey Limited Liability Company; R&R Auction Company, LLC; Roger Epperson doing business as Signed Sealed and Delivered and Roger Epperson Authentication, Ltd; Steve Cyrkin, individually and doing business as live.autographmagazine.com; and Momentica, LLC, a California Limited Liability Company, <br><br>         Defendants. | Case No.: 2:15-cv-05288 <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> **1.  VIOLATION OF 15 U.S.C. §1** <br> **2.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br> **3.  VIOLATION OF CALIFORNIA BUS. & PROF. CODE §17200** <br><br><br> **DEMAND FOR JURY TRIAL** |

1       Plaintiffs Nelson Deedle and Iconographs, Inc., (collectively referred to as

2  "Plaintiff" or "Deedle") hereby complains against Defendants Collectors Universe,

3  Inc., doing business as PSA/DNA, James Spence Authentication LLC, R&R Auction

4  Company, LLC, Roger Epperson doing business as Signed Sealed Delivered and

5  Roger Epperson Authentication, Ltd., Steve Cyrkin, and Momentica, LLC,

6  (collectively referred to as "Defendants"), and alleges as follows:

7       1.   All allegations in this Complaint are based upon information and belief

8  with the exception of those allegations, which are based upon personal knowledge.

9  Plaintiff's information and belief is based upon Plaintiff's own investigation and the

10  informal discovery and investigation conducted by Plaintiff's counsel to date.  Each

11  allegation in this Complaint either has evidentiary support, or alternatively, is likely

12  to have evidentiary support after a reasonable opportunity for further investigation or

13  discovery.

## I.   <u>INTRODUCTION</u>

15       2.   In the autographed entertainment memorabilia industry, the authenticity

16  of an item is the value of an item.  Like other collectable industries, authenticity is

17  determined by a select few authenticators who specialize in a particular subject

18  matter.  Dealers and consumers alike are forced to rely on these authenticators to

19  determine which items are genuine, and which items are not.  Items that cannot be

20  authenticated are worthless.  This gives authenticators the power to determine the

21  supply, and therefore the value, of items available to dealers and consumers within

22  the market.  It also gives the Defendants the power to say that all items sold by a

23  particular competitor are valueless.  Defendants have joined together as a close

24  association of dealers, auction houses, authenticators, and public personalities to deny

25  the authenticity of genuine items that competing dealers are attempting to sell to their

26  customers.  Defendants have violated Section 1 of the Sherman Act by agreeing

27  among themselves to eliminate competition from the market, like Deedle and others,

28  by claiming items are not authentic based solely on the competitor, not the merits of

the items.  Their actions significantly reduced the number of dealers and authentic items within the market available to consumers.  This hurts competition.  Also, such activity is per se illegal according to federal anti-trust laws.  Deedle now comes to hold Defendants responsible and break up Defendant's cartel.

## II.   JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action according to 15 U.S.C §15 and 28 U.S.C. § 1331.

4.    Venue is appropriate in this district under 15 U.S.C. §22 and 28 U.S.C. §1391(b) because Defendants Collectors Universe, Inc., doing business as PSA/DNA, Steve Cyrkin, and Momentica, LLC, all transact business in this district and a substantial part of the events that give rise to this claim happened in this district.

## III.   PARTIES

5.    Plaintiff Nelson Deedle is an individual residing in the State of California, and is a leading dealer in autographed memorabilia throughout the United States for at least 25 years.  Deedle operates as a dealer on an individual basis and through his company, Iconographs, Inc., a Nevada corporation.

6.    Defendant Collectors Universe, Inc., is a Delaware Corporation, doing business as and through its division known as PSA/DNA ("PSA/DNA").  PSA/DNA is an autograph authentication company and is the self-proclaimed "leading third-party authentication service for autographs and memorabilia."  ABOUT PSA AND PSA/DNA, http://www.psacard.com/About/PSA/ (last visited April 16, 2015).  PSA/DNA's principal office is located in Orange County, California.  It may be served with process by serving its registered agent Michele R. Taylor at its registered address at 1921 E. Alton Ave., Santa Ana, California 92705.

7.    Defendant James Spence Authentication LLC, is a New Jersey Limited Liability Company ("JSA").  JSA is an autograph authentication company and is the self-proclaimed "foremost autograph authentication service in the world."

1   AUTOGRAPH AUTHENTICATION FOR SPORTS MEMORABILIA,

2   http://www.spenceloa.com (last visited April 16, 2015).  JSA operates out of two

3   principal offices located in the States of New Jersey and Florida.  It may be served

4   with process by serving its registered agent in New Jersey, Roy I. Weitzer, at its

5   registered address in New Jersey at 143 Washington Street, Morristown, New Jersey

6   07960, or its registered agent in Florida, James Spence, III, at its registered office in

7   Florida at 3223 N.W. 10th Terrace, Suite 104, Fort Lauderdale, Florida 33309.

8        8.     Defendant R&R Auction Company, LLC, is a New Hampshire Limited

9   Liability Company ("R&R").  R&R is an online autograph auction company that sells

10  and authenticates autographed memorabilia to the public throughout the world,

11  including the State of California.  R&R may be served with process by serving its

12  registered agent in New Hampshire, Gallagher, Callahan & Gartrell, P.C., at its

13  registered office in New Hampshire at 214 N. Main Street, Concord, New Hampshire

14  03301.

15       9.     Defendant Roger Epperson, individually and doing business as Roger

16  Epperson Authentication, Ltd. and Signed Sealed Delivered, (collectively

17  "Epperson") is a resident of the State of Texas and does business throughout the

18  United States, including the State of California, through his various business entities

19  and on behalf of PSA/DNA and JSA.  Epperson may be served with process at his

20  address at 11011 Tulip Garden Court, Houston, Texas 77065, or any other place that

21  he may be found.

22       10.    Defendant Steve Cyrkin, individually and doing business as

23  live.autographmagazine.com (collectively "Cyrkin") is a resident of the State of

24  California and does business throughout the United States through his website

25  live.autographmagazine.com.  Cyrkin may be served with process at his address at

26  3650 Aspen Village Way, Apt E., Santa Ana, California 92704, or any other place

27  that he may be found.

28

11.     Defendant Momentica, LLC, a California Limited Liability Company ("Momentica"), is the registered domain owner of autographmagazine.com, the domain in which Cyrkin uses to do business.  Momentica may be served with process by serving its registered agent in California, Steven L. Cyrkin, at its registered address in California at 3650 Aspen Village Way, Apt. E, Santa Ana, California 92704.

12.     Whenever in the Complaint reference is made to "Defendants, and each of them" such allegations shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

13.     Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned herein, each of the Defendants were the agent, servant, employee, co-venturer, and co-conspirator of each of the remaining Defendants, and was at all times herein mentioned, acting with the course, scope, purpose, consent, knowledge, ratification, and authorization for such agency, employment, joint venture and conspiracy.

## IV.   FACTUAL ALLEGATIONS

**A.    The Autograph Memorabilia Industry**

14.     The autographed entertainment memorabilia industry (the "industry") is a two billion dollar industry that consists of the buying and selling of autographed items (collectively "items") signed by various entertainment, sports, and political celebrities (collectively the "celebrities").  Unlike other industries, the entertainment memorabilia industry is unique in that it consists entirely of rare, hard to find items that cannot be mass produced.  There is no substitute for authentic memorabilia. Dealers within the industry are limited to a select few individuals and companies with personal access to celebrities and thousands, if not hundreds of thousands, of dollars to spend.

15.     The industry is comprised of dealers, auction houses, third-party authenticators, and end consumers.  To sustain the market, dealers, auction houses,

and consumers depend on third-party authenticators, of which two dominate the market, those being Defendants' PSA/DNA and JSA, to ensure authenticity of the items sold.  Authenticated items can sell for up to a thousand times more than the same non-authenticated item.

16.   Within this highly concentrated market are a select few individuals that multiple companies, including auctioneers, dealers, and authenticators, share amongst themselves to control the industry to the detriment of those that are not in this "inner circle."  It is through this Cartel of companies and their agreement with each other that the major, self-interested, third-party authenticators can drive out the competition from the market and ensure their preferred auction houses and dealers thrive.

17.   The Defendants make up this inner-circle and have engaged jointly in a campaign to remove dealers from the market and maintain anticompetitive barriers to enter the market.  Defendants are using their conjoined market power through the authentication process to stifle legitimate competition in the industry by agreeing to *not authenticate items* based on the individual competitor, like Deedle, that offer the items for sale.  The Cartel don't decide authenticity on the merits – they find lack of authenticity just to shut down competition.  Further, Defendants attempt to foreclose competition by disparaging items sold by dealers, including Deedle, as "forgeries" in public forums.  Cartel members label their competitors purveyors of forgeries, based on the items the Cartel declare as inauthentic.

18.   At the heart of the industry are the items that people collect.  These items are physical objects that are actually signed by historical or contemporary celebrities.  For historical items, dealers and collectors will purchase these items from numerous sources, including directly from the estates or families of deceased celebrities, other dealers and collectors, or from auctions.  Authentic historical items cannot be reproduced.  They are limited in existence and increase in value with rarity.  For contemporary items, dealers have only a few avenues by which to obtain autographed items: They pay celebrities large sums for private signings, they buy existing

collections at retail rates, they may have anecdotal contact with celebrities and an opportunity for a signature, or attend in-person events where collectors/dealers actually witness the celebrity signing the item. Obtaining contemporary items can cost thousands of dollars if done by personal contract and requires valuable inside connections to celebrity agents.

19.   Dealers, including Plaintiff, sell their items mostly online and occasionally at memorabilia shows.  Most, if not all, transactions take place online in an auction format.  Dealers utilize third-party auctions to cosign items for sale, largely through eBay.  RR Auctions sell exclusively online along with a catalog of items for sale.

20.   When dealers acquire items for resale, Dealers must issue their own certificates of authenticity ("COA") certifying that the item is authentic.  In addition to COAs, Dealers will also provide a money-back guarantee to the authenticity of the items they sold, making it against their economic interest to sell forged items. Dealers are able to issue their COAs and guarantee the authenticity of their items based on their own personal knowledge of the history of the item, including personally witnessing the item actually being signed by the celebrity, or by using their own authentication processes to ensure the authenticity of the item.  For over one hundred years, Dealers would sell their items without any third-party authentication.  Today, technological advances make it easy to forge COAs making the use of a third-party authenticators indispensable to the industry.

21.   The value of an item is based in its authenticity.  Items that are branded inauthentic are basically worthless.  Therefore, to ensure the value of their items that they are purchasing, consumers rely on third-party authentication services to verify the authenticity of an item.  Two firms dominate the third-party authentication market: Defendants PSA/DNA and JSA.  Both verify hundreds of thousands of signatures each year.  PSA/DNA and JSA are two of only three approve third-party authenticators for use with eBay, the largest consignment auction online.  Dealers and

1  collectors that purchase items will use PSA/DNA and JSA for opinions regarding the

2  authenticity of an item, and  if PSA/DNA or JSA find that an item is not authentic,

3  then the dealer or collector will go back to the source where he purchased the item

4  and demand a refund.

5          22.    When items are sold using an auction house on consignment, each

6  auction house typically has an acquisitions person or a consignment director who

7  examines items presented by dealers and collectors to be placed on consignment and

8  put on sale via an auction.  The auction house will either judge the authenticity of the

9  item through an in-house authenticator, or it will utilize a contracted authenticator.

10 Once it passes authentication and its value is proved, the consigned item is then

11 placed in the auction house's catalogue.  The catalogue describes the item and states

12 who has authenticated the item.  Auction houses partner with a third-party

13 authenticator or promote that it uses a third-party authenticator to bolster its

14 credibility under the illusion of objectivity and neutrality.

15         23.    Within this market, PSA/DNA, JSA, R&R, Epperson, and Cyrkin have

16 joined together in a conspiracy, through their intertwined relationships, to drive out

17 their competition, such as Deedle, to the detriment of competition in the market and

18 to Deedle's harm.

19 **B.     The Relevant Market**

20         24.    The relevant "product" market impacted by Defendants' antitrust

21 violations are the nationwide markets for authentic autographed sports and

22 entertainment memorabilia.

23         25.    Because the industry is so specialized and items cannot be mass

24 produced, there is no separate or different source for autographed memorabilia items

25 available to the end consumer.

26         26.    The relevant "geographic" market for determining Plaintiff's antitrust

27 claims is the United States.

28

## C.    The Cartel

27.    PSA/DNA, JSA, R&R, Epperson, and Cyrkin have conspired together in a network of influence, to discourage their competition through using the power of PSA/DNA and JSA's market influences over the public perception of the authentication of items that are sold in the market.  A review of the major actors shared among these select organizations demonstrates the Cartel that the Defendants have created in the autograph memorabilia marketplace.

28.    PSA/DNA claims to be the "largest and most trusted third-party grading and authentication company in the world." About PSA CollectibleFacts [sic], available at http://www.psacollectiblefacts.com/about (last visited September 23, 2015). PSA/DNA process over 100,000 items each month. *Id.*

29.    JSA claims to be the premier autograph authenticator in the world, assessing thousands of autographs daily.  Autograph Authentication Services, available at http://www.spenceloa.com/AboutJSA (Last visited September 23, 2015).

30.    PSA/DNA and JSA together account for more than 80% of the third-party authentication services in the relevant industry.

31.    Although PSA/DNA and JSA appear to be competitors, most of PSA/DNA and JSA's authenticators perform as authenticators for each company, meaning the same authenticators are acting on behalf of both PSA/DNA and JSA.  In addition, some authenticators that are working for PSA/DNA and JSA are also authenticating through their own services, such as Epperson and John Reznikoff, or providing authentication services for auction houses, such as R&R, who stand to profit by ensuring that PSA/DNA or JSA, and their authenticators, are closely aligned to pass their items as authentic.  Furthermore, most authenticators that PSA/DNA, JSA, and R&R use are also dealers themselves, who stand to make a profit from ensuring their items pass PSA/DNA, JSA, or R&R authentication through working both sides of the deal – dealing in autographs and authenticating those autographs through PSA/DNA, JSA, and R&R to ensure their value and ultimate sale. A review

of each defendant and their advertised experts shows how deep these relationships run to ensure that this cartel can control the market.

### 1.    The Cartel Shares the Same Authentication Staff

32.    At all times relevant herein, PSA/DNA employed Roger Epperson, James Spence, Bob Eaton, John Reznikoff, Steve Zarelli, James Camner, Rich Consola, and Wade Hampton as authenticators for its services.

33.    JSA employs most of the same experts as well, including Roger Epperson, James Spence, Bob Eaton, John Reznikoff, Steve Zarelli, Wade Hampton, and JD Bardwell.

34.    Most of these authenticators do not just work for PSA/DNA and JSA, but also for R&R, which uses Roger Epperson, Bob Eaton, John Reznikoff, Steve Zarelli, James Camner, and Rich Consola to authenticate items submitted for consignment.

35.    James Spence began JSA after leaving PSA/DNA.  He is the current owner/operator of JSA and also deals in autographed memorabilia.  During his time at PSA/DNA and now at JSA, James Spence has consistently dealt in autographed memorabilia through his entity out of Pennsylvania, James Spence III Vintage Autographs, LLC.

36.    Bob Eaton is the owner and founder of R&R.  Through R&R, Bob Eaton sells thousands of autographed memorabilia through consignments and profits through those sales.  He is also a listed expert for PSA/DNA and JSA, and routinely ensures that items being sold on R&R pass PSA/DNA or JSA authentication so that he can profit from such sales.

37.    John Reznikoff is the owner of University Archives, dealing in autographed and signed memorabilia from political figures.  Through University Archives, Reznikoff sells signed memorabilia as well as his authentication services. In addition, he is a listed authenticator for PSA/DNA, JSA, and R&R.  Some of the items that Reznikoff sells through University Auctions actually carry letters of authenticity from JSA and PSA/DNA.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38.     Steve Zarelli is the owner of Zarelli Space Authentication, LLC, providing authentication services for PSA/DNA, JSA, and R&R.  Included in his services, Zarelli also actively promotes R&R by advertising the auction house as the premier auction for space services, which such auctions carry Zarelli's certifications of authenticity.

39.     James Camner is the owner of La Scala Autographs, dealing in opera, music, and theatrical autographs.  Through his website and on eBay, Camner sells hundreds of autographed memorabilia.  In addition to his sales, he actively authenticates for PSA/DNA and R&R.

40.     Roger Epperson is a third-party autograph authenticator and autograph dealer.  Epperson offers his authentication services through his business known as Roger Epperson Authentication, Ltd., and deals in autographs through his business known as Signed Sealed Delivered.  Epperson also currently provides authentication services for R&R, and during the relevant times as provided herein provided authentication services for PSA/DNA and JSA.[1]  As late as 2014, PSA/DNA advertised Epperson as part of their "Dream Team" and was "PSA/DNA's Music Man."[2]  In addition, Epperson himself advertises that he is "the full time music authenticator for JSA since November 2006 – Present."[3]

41.     Furthermore, Epperson and Cyrkin are close allies on Cyrkin's website he runs through Momentica, known as Autograph Magazine Live, where Cyrkin fully endorses Epperson and Epperson fully endorses Cyrkin publicly.  They both shame other dealers right out of business.  Furthermore, Cyrkin and Epperson actively ran advertisements for Epperson's businesses on the website to promote his businesses over other dealers.

42.     Steve Cyrkin is an autograph collector, dealer, and authenticator.  Cyrkin

---

[1] http://www.spenceloa.com/OurExperts
[2] http://web.archive.org/web/20140810095137;
http://www.psacard.com/Articles/ArticleView/4616/buildingadreamteam
[3] http://autographalerttruth.com/credentials.html.

is also one of the founding owners of Collectors Universe (the parent company of PSA/DNA); in fact, Cyrkin at one time owned 1,000,000 share of Collectors Universe, Inc. stock and may still own stock.  Cyrkin owns the website named Autograph Magazine Live through his entity, Momentica, and uses this website to host blogs, sell merchandise and advertising regarding autographed memorabilia, and comment about the market, including using the website as his public platform to promote certain dealers and authenticators in the market and totally destroy others. Cyrkin and Epperson actively use the website to defame, denigrate and label other dealers and authenticators as purveyors of forgeries in hopes of driving business to either Epperson, to PSA/DNA, or to any of their own friends in the industry, including R&R and JSA.

### 2.    The Cartel Also Shares Information

43.    In addition to sharing the same experts, these seeming "competitors" in the autograph memorabilia market are not competitors in any sense of the word. Through their shared staff and relationships, the cartel routinely shares information with each other regarding the autographed memorabilia market. In furtherance of their agreement, this information is then used to determine which dealers in the market get their items authenticated.

44.    As an example, Cyrkin routinely includes Epperson, John Reznikoff, Bobby Livingston (of R&R), and Bob Eaton (of R&R and PSA/DNA) on private emails when discussing other sellers or authenticators and their business, including persons like Deedle and another man, Steve Koschal.  Furthermore, through other litigation, Epperson routinely shares information he obtains in discovery with Cyrkin.

45.    R&R and PSA/DNA also collaborate on the authentication of items that R&R sells.  In one circumstance, an R&R customer bought over $70,000 of items in an auction that R&R hosted and guaranteed the authentication of the items.  The customer submitted the items to PSA/DNA after the auction for authentication without disclosing the fact that the items came from R&R.  PSA/DNA failed the

authenticity of these items, and upon the customer requesting refunds from R&R, R&R' representative Bobby Livingston immediately engaged PSA/DNA's Joe Orlando and Byron Walters for an explanation.  Through various emails, R&R Auctions even requested that PSA/DNA work with R&R to make R&R whole for the PSA/DNA fees that it was going to reimburse the customer.  Thus, R&R is ensuring the authentication of its items from PSA/DNA so much that whenever PSA/DNA fails the authentication of an item that R&R sells (without knowing that it came from R&R), R&R demands that PSA/DNA make it whole for the transaction.

### 3.    *The Cartel Uses Their Power to Drive Out Competition*

46.    Instead of judging the authenticity of an item based on the signature and the item itself, PSA/DNA, JSA, R&R, Epperson, and Cyrkin are all using their market power they have created from their agreement to employ and utilize this network of authenticators, dealers, and media personalities to come together to ensure that certifications of authenticity are issued only to those dealers that they approve. Using this power, the Cartel not only force dealers, like Deedle, out of the market, they restrict the number of authentic items within the market raising the prices of the items they sell to the public.

47.    Dealers that are out of favor with the Cartel, such as Deedle, cannot authenticate their memorabilia; hence they are forced out of the market entirely. Without dealers in the market who can offer authentic memorabilia, Defendants have foreclosed competition and restricted the number of items on the market available to potential buyers.

48.    PSA/DNA, JSA, R&R, Epperson, and Cyrkin, have created a cartel where through their agreement they can control the authentication market to ensure the items sold through R&R or through the authenticator's own dealer-websites are "certified" authentic, and therefore, more valuable.  Furthermore, this Cartel exists to drive out any competition from the market by intentionally failing the authenticity of a dealer's items based on the dealer's identity and not on the item itself.

49.     The Cartel has impeded competition by cutting off certain markets for its competitors.  One prime example is the following:  The Cartel, when faced with competition in sales of autographed memorabilia through eBay, sought to prevent vendors, including Deedle, from selling through eBay.  The Cartel members comprise 66% of the "approved" authenticators on which eBay relies for authentication services for items sold on eBay.  To prevent competition, the approved eBay authenticators and members of the Cartel claimed that their competitors' items were not authentic, when that was not true.  As a result, eBay, trusting in its own authenticators, shut down Deedle and other competitors' sales on eBay – eBay was and still is one of the main pipelines for sales of autographed memorabilia in the United States.

50.     Significantly, eBay is a platform to engage in competition and a way for a new seller of autographed memorabilia to gain a foothold in the business.  For those reasons, the Cartel vigorously and illegally tried to close down new competitors like Deedle and others.

51.     The Cartel has engaged jointly in an extensive campaign of deceit and manipulation to falsify and rig the authentication process. The nature of their actions and disparaging statements concerning competitors, including Deedle, are relied upon by consumers. Defendants' actions in conjunction with its influence over the authentication services has made it difficult and costly, if not impossible, for competitors such the Plaintiff to remain in the market.

**D.     The Cartel Colludes to Automatically Fail Deedle's Memorabilia**

52.     Throughout the years, PSA/DNA, JSA, R&R, Epperson, and Cyrkin have come together and agreed to reject the authenticity of the memorabilia that dealers, such as Deedle, sell, not based on the actual authenticity of the various items, but based on who the dealer is – if the dealer is in the Cartel, the items are authentic.  If the dealer is outside the Cartel, the items are inauthentic.  It's as simple as that.  The individual Defendants' actions show that they are in agreement with one another, as

they share the same experts who publicly malign Deedle as well as fail his items as non-authentic.

53.   Sometime in the early part of the 2010's, Roger Epperson found out that Deedle purchased Iconographs, Inc., and was dealing under that name.  Despite Epperson signing up for Iconographs' auctions under Deedle's ownership, bidding on autographs based on their own merits and placing orders for autographs via email, Epperson protested his disdain for Deedle to fellow Cartel members, including Cyrkin.  Epperson further protested in an email to Deedle that he didn't know that Deedle owned Iconographs when he attempted to buy autograph from Iconographs. It became clear that Epperson's behavior was not based on the merits of the autographs but rather something more nefarious.  Because of Deedle's business with another autograph dealer that Roger Epperson did not like - Todd Mueller – Roger Epperson began a public decry of Deedle with Cyrkin on Cyrkin's website live.autographmagazine.com.  In turn, PSA/DNA, JSA, and RR Auction began to fail the authenticity of Deedle's items just because Deedle sold the items – not based on the individual authenticity of each item.

### 1.   *PSA/DNA's Actions*

54.   Since around 2010 or 2011, PSA/DNA has begun to fail all of Deedle's items, not based on the authenticity of the items themselves, but on the fact that Deedle sells the items.  Below are examples, among many more, of PSA/DNA's failing of Deedle's items based on the fact that Deedle sold the item.

a.   In 2011, Ian Causer, an autograph dealer in the United Kingdom, purchased three Harrison Ford autographed photographs from Deedle. He resold one of the photographs to another customer who then submitted the item to PSA/DNA for authentication.  PSA/DNA summarily failed the authenticity of the item based on seven (7) different reasons in line with their standard letter (see below).  Mr. Causer demanded a full refund for all photos because all of them, like the one,

14

would fail PSA/DNA's authentication process.  Deedle refunded Mr. Causer's money and Mr. Causer has since ceased doing business with Deedle because of the embarrassment.

b. In 2011, Chris Sink purchased six autographed album covers from Deedle and submitted two of them (a Carlos Santana LP cover and a Neil Young LP cover) to PSA/DNA for authentication.  PSA/DNA summarily failed the authenticity of these items even though Deedle actually procured the Young LP cover himself from Neil Young!  Nonetheless, Deedle was required, according to his own guarantee, to refund Mr. Sink's money and since then Mr. Sink has failed to do business with Deedle.  In fact, Mr. Sink was so upset about the fact that PSA/DNA failed the authenticity of Deedle's item that he joined Epperson's campaign against Deedle on live.autographmagazine.com.

c. Joe Zacarro purchased a number of items from Plaintiff from 2009 until 2011.  In late 2011, Zacarro, after a string of rejections from PSA/DNA and JSA (see below), stopped purchasing from Plaintiff unless PSA/DNA and JSA started to pass the authentication of items that Plaintiff sold.  Included in the string of rejections were items that Zacarro purchased from Deedle that PSA/DNA and JSA rejected that Deedle actually obtained from private signing with Gary Busey and Peter Mayhew.

d. Similar to Zacarro, Gary Novak purchased a number of items from Plaintiff well into 2014.  However, Novak stopped purchasing from Plaintiff because PSA/DNA (and JSA) would continually fail all of the items Novak purchased from Plaintiff.

55.   One of the most glaring examples of how PSA/DNA operates to eliminate  competitors outside the Cartel is PSA/DNA's "Quick Click Opinion". Through this option, consumers can received PSA/DNA's "quick opinion" regarding the authenticity of an item that is being sold in an online auction.  To receive an

opinion of whether the items is "likely genuine" or "not likely genuine", a consumer must fill out a "submission form" on PSA/DNA's website for $15 per item review, or $10 for an item sold on in an eBay auction.  According to the submission form, a consumer *must* indicate what auction the item is listed in, indicating exactly *who* is selling the item through the auction or what auction house is selling the item. PSA/DNA then has the ability to control the opinion not based on the authenticity of the item itself, as would be available if a consumer was able to just upload an image, but based on who is selling the item, which is exactly what PSA/DNA is doing to harm dealers such as Deedle.

56.    Starting sometime in 2010 or 2011 and continuing to this date, Deedle has received numerous complaints from his now former customers that PSA/DNA's quick click opinion almost always indicated that items with his COA were "likely not authentic" whether the item was sold on Deedle's own website or consigned on a different auction website with Deedle's COA.

57.    Because of these issues, Deedle decided to test PSA/DNA's quick click opinion.  On July 30, 2012, Deedle purchased 8 autographed items from multiple sources that had PSA/DNA certifications already on the item in the eBay auctions. Deedle then removed the PSA/DNA certifications on the digital images that represented the items using Adobe Photoshop.  Deedle then reposted the items for sale on Plaintiff Iconograph's website for sale using the Photoshopped images and then submitted the links to the items to PSA/DNA's quick click opinion service using a new, dummy identification.  As a control, Deedle also submitted a random item from eBay to the quick click opinion service at the same time using the same dummy identification.  PSA/DNA returned *all* of the original 8 items that Deedle had posted on Iconograph's website for sale as "likely not authentic" and PSA/DNA returned the control item on eBay as "likely authentic".  Thus, even though the 8 items were previously authenticated by PSA/DNA, when the certifications were removed and posted on Plaintiff's website, PSA/DNA then called them not authentic.  This

operation shows that PSA/DNA authenticates items based on the dealer, not the item.

### 2.    JSA's Actions

58.    Since 2010 and 2011, JSA, in furtherance of its agreement with PSA/DNA, has failed all of Deedle's items, not based on the authenticity of the items themselves, but on the fact that Deedle sells the items.

59.    Included in JSA's total rejection of Deedle's items are the following examples:

a.    Joe Zacarro, as described above, purchased numerous items from Deedle over a three year period.  During this time, JSA began to routinely reject the authenticity of any items that Zacarro presented for authentication to JSA that he had obtained from Deedle, including items that Deedle actually obtained personally from "in-person signings".

b.    Bob Jones was a regular customer of Plaintiff's until JSA began failing all of Deedle's items.  Sometime in 2011, Bob Jones acquired a collection of items from Deedle and then submitted them to JSA.  Deedle had to refund all of Jones' moneys because, as Jones informed Deedle, "JSA returned [the] package after 7 weeks and said every item was not authentic including names identical to those they passed before…" Deedle had to refund everything Jones had purchased.  Jones has since stopped buying from Deedle.

c.    In 2013, after having issues with JSA authenticating Deedle's items, Pristine Auctions, an auction house, required all items sold through Pristine to have JSA Certificates of Authenticity.  Because of this, Deedle submitted approximately one hundred items to Pristine without his own COA on them.  Pristine then submitted the items to JSA for authentication.  Every item passed JSA's authentication.  However, at the same time, Deedle had Pristine submit items with Plaintiff Iconographs COA to JSA as well.  JSA failed 90 of the 92 submitted for

17

authentication.  Most items from both submissions were of the same names and from the same signings, including documented private signings.  However, JSA discriminated against the authenticity of the items solely on the fact of where they came from; if from Deedle/Iconographs, then not authentic.

60.    In 2014, JSA's actions were confirmed through one of Deedle's former longtime customers, as noted above, Gary Novak.  Novak gave a friend 84 items to have JSA authenticate at trade show in Chicago.  Gary's friend submitted the 84 items to Charlie Price (JSA's authenticator) for authentication, 3 of which came from Deedle.  Price passed the 81 items as authentic that did not come from Deedle, and rejected the authenticity of the 3 items that came from Deedle, stating that "I know where [the friend] got these and they're no good."  Novak returned these items to Deedle for a refund and has not purchased any items from Deedle since.

61.    Later in 2014, Deedle, knowing that JSA was failing his items based on the sole fact that he sold them tried his theory.  Deedle took two of the three items that Novak returned – a Jim Carrey signed photo and a Sugarland signed photo – and removed his COA.  He then gave the Carrey to a friend to take for JSA authentication at the Beverly Hills Baseball Card shop in Beverly Hills, California.  JSA passed the authentication of the Carrey photo (JSA #K74862) without the Iconographs COA even though JSA had failed the authenticity of the exact same photo a few months earlier when it had the Iconographs COA.

62.    Likewise, Deedle provided the Sugarland photo, *sans* COA, to a different friend to take to the Frank & Sons Show in Southern California in December, 2014.  Again, JSA passed authentication of the Sugarland photo (JSA #L70070) without the Iconographs COA even though JSA had failed the same exact photo a few months before when it had the Iconographs COA.

### 3.    *PSA/DNA and JSA Use Essentially the Same Form Rejection Letter*

63.    PSA/DNA and JSA's letters rejecting the authenticity are basically the

same type of form letter.  PSA/DNA includes ten (10) reasons that an item is not authentic, with no specificity as to exactly why an item failed authentication.  One of the reasons (No. 10) is actually "Other: _____", with no information filled in.  JSA issues a similar form letter including thirteen (13) reasons that any item is not authentic.  Other than a few additional reasons, one omission, eight of JSA's reasons are the exactly identical to eight of PSA/DNA's reasons, including the same exact wording, capitalization, and punctuation.

### 4.    R&R' Actions

64.    Before the cartel began their campaign against Deedle, Deedle and Bob Eaton (with RR Auctions) had a good relationship.  Deedle's relationship with Eaton lasted over 20 years with Eaton continuously seeking Deedle's autographs and Deedle selling Eaton thousands of items valued at least $500,000 without incident, dispute, or complaint over authenticity.  However, after Epperson began his public campaign against Deedle, RR Auctions began failing items that Deedle personally attempted to consign through RR Auctions' auctions as well as items that other persons were attempting to consign with RR Auctions.  The degradation of the relationship between Deedle and RR Auctions is intrinsically linked with Epperson's anti-competitive view of Deedle, as Epperson acts as RR Auctions' expert authenticator for music memorabilia.  In fact, Cyrkin told Deedle over the phone that RR Auctions would soon no longer accept Deedle's consignments several months before Livingston stated that was the case.  Just like PSA/DNA and JSA, RR Auctions began failing items with Deedle's COA because they came from Deedle.  In the summer of 2014, RR Auction contacted Deedle several times by phone, and email asking Deedle to consign autographs to their annual music auction.  Deedle sent his longtime associate Bob Eaton (of RR Auction) a large consignment package via Federal Express largely consisting of autographs that Deedle obtained himself, obtained from a private signing or from well know book signings.  Although the items were unquestionable authentic and consistent with items that RR Auction

routinely sells, Deedle received a rejection letter from Bobby Livingston (on behalf of RR Auction) informing Deedle that RR Auction had consulted with outside experts (undoubtedly Epperson, PSA, or both) and did not feel that the autographs would appeal to their clientele.  Deedle called Livingston immediately after receipt of the return and Livingston confirmed to Deedle that RR Auction was ceasing to do business with Deedle because of their close relationship with Epperson and RR Auction's distain for Deedle's association with other dealers, such as Todd Mueller. In the year since RR Auction rejected Deedle's items, RR Auction has sold similar items.

65.    In 2012, Gary Harvey purchased a Pearl Jam signed album cover from Plaintiff with Plaintiff's COA and tried to consign it with RR Auctions.  When Harvey first submitted the album for consignment, RR Auctions approved the authenticity of the item for sale on Harvey's scanned image of the album cover that did not include the Iconographs COA.  However, when RR Auctions received the actual, physical item from Harvey for consignment, which included the Iconographs COA, RR Auction then changed its mind and told Harvey it could not auction the item because it was inauthentic.

### 5.    *Epperson's & Cyrkin's Round Out the Cartel With Publicity*

66.    Epperson has actively used live.autographmagazine.com, operated by Cyrkin, to call items sold by competitor dealers, such as Deedle, forgeries. Multiple posts show that Epperson has an interest in attacking all of Deedle's items as forgeries.

67.    Epperson is not operating in a vacuum by making these statements, but openly and publicly. From 2010 until now, Epperson publicly suggests all of Deedle's items are forgeries while at the same time providing authenticating services for PSA/DNA, JSA, and RR Auctions.  Instead of focusing on each individual item, Epperson, accuses competitors, such as Deedle, of selling forged items in public, and fails to authenticate the competitor's items through his authentication services at

PSA/DNA, JSA, and RR Auctions.

68.    In essence, Epperson is using his web site (live.autographmagazine.com), his agreement with PSA/DNA, and his current authentication positions with RR Auctions and JSA to ensure that competitors, such as Deedle, cannot sell items as authentic so that Epperson can sell more of his items.

69.    Furthermore, Epperson has rejected items that Deedle tried to sell as inauthentic just because they came from Deedle.  Bob Jones submitted certain items to Epperson for authentication and for purchase that Jones had purchased from Deedle.  However, Epperson emailed Jones telling him that he (Epperson) did not feel comfortable doing business with Jones because he was purchasing items from Deedle.  Shortly thereafter, Jones submitted 6 items to Epperson for authentication that contained the Iconographs COA, which Epperson summarily failed the authenticity of each item.  Around this same time, Epperson, exemplifying his anti-competitive behavior, informed Jones that Deedle himself was forging these items and likened Deedle to a cocaine dealer.

70.    Cyrkin, similar to Epperson, has also openly and publicly denounced items sold by the Cartel's competition as forgeries.  Cyrkin, like Epperson, does not do this in a vacuum either, but as a co-founder and one-time large stock holder of PSA/DNA's parent company Collectors Universe and Epperson's closest ally in the industry.  In fact, Epperson at one time paid Cyrkin or Momentica over $6,000 per year in advertising monies to advertise on live.autographmagazine.com.  Although Cyrkin has publicly stated that he isn't an expert – that doesn't stop him from making malicious attacks concerning autographs that are offered by competitors, such as Deedle.  Cyrkin and Epperson work closely to promote the cartel.  In one instance after Cyrkin denounced an autograph that Iconographs was selling as an "obvious forgery," Epperson followed up announcing that he had the same autograph for sale.

71.    Through his agreement with the Cartel, Cyrkin labels items sold by competitors as forgeries in exchange for  advertising revenues from other, friendly

1   dealers and auctions houses, such as Epperson, as well as helps PSA/DNA earn more

2   money by encouraging consumers to use PSA/DNA's services to further validate

3   what Cyrkin and Epperson have already said. In an industry where value is

4   determined by authenticity, Cyrkin's false accusations are more than just rhetoric.

5   Cyrkin is the voice of the machine that determines which dealers are allowed to

6   participate in the market.  Cyrkin eliminates competition by branding dealers, such as

7   Deedle, as forgers in public forums driving consumers to other members within the

8   Cartel.  This cycle of interwoven relationships and information sharing based on

9   Cyrkin's statements that Deedle's items are all inauthentic ensure that Cyrkin,

10  Epperson, PSA/DNA, JSA, and RR Auctions will get all the market share and

11  resulting profit.  It also ensures that Deedle is forced out of the legitimate competition

12  of selling authentic autographed memorabilia.

13      72.   Cyrkin routinely edits or deletes posts that are not in the interest of the

14  cartel or close friends, a form of anti-competitive "information management."

15  Negative posts about RR Auction, or close friends like Autograph Pros and UK

16  dealer Gary King have been drastically edited or deleted all together.  In one instance

17  an entire thread exposing Gary King for selling thousands of dollars of forged music

18  autograph was deleted by Cyrkin.  Although Cyrkin has been told by Deedle, and

19  Deedle's agents, that several posts about Deedle are not accurate or outright lies,

20  Cyrkin refused to take action and remove these false statements.

21      73.   Furthermore, Cyrkin has reached out to Deedle's customers, similar to

22  Epperson, to denounce Deedle and harm Deedle's business.  Sometime in 2012,

23  Cyrkin emailed Bob Jones and told Jones that Cyrkin "knew" that Jones was trying to

24  sell forgeries that came from Deedle and that the FBI was getting involved.  This

25  email prompted Jones to discontinue purchasing any further items from Plaintiff.

26      74.   The Cartel's actions have grievously injured competition in this market.

27  Example:  Assume that only six black top hats exist which are signed by Abraham

28  Lincoln.  Deedle has two of them.  Defendants have the other four.  The defendants

22

proclaim in the online discussion forums and elsewhere that Deedle's top hats are forgeries.  One of the Cartel members deem Deedle's top hats inauthentic.  The educated consumers of autographed memorabilia will not purchase from Deedle.  The two top hats held by Deedle are tainted and valueless.  The remaining top hats immediately become more rare and more expensive for the consumer.  Abraham Lincoln can sign no more top hats so there is no alternative source for these items.

75.    As a result of all of this anti-competitive behavior, Deedle's sales have dwindled.  Other would-be competitors have been completely shut down or their sales have been severely curtailed as a result of the anti-competitive behavior alleged above.  The public has been harmed.

76.    Deedle now brings the following causes of action to hold this cartel of PSA/DNA, JSA, R&R, Epperson, and Cyrkin responsible for the damage they have caused to the autograph memorabilia industry as well as his own business.

**First Cause of Action**

**Violation of 15 U.S.C. §1**

**(Against All Defendants)**

77.    Plaintiff alleges and incorporates each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

78.    Section 1 of the Sherman Act provides that "[e]very ... combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is hereby declared to be illegal." 15 U.S.C. § 1.

79.    As detailed herein, PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica have all joined together in a combination or conspiracy to agree to boycott certain autograph memorabilia dealers in the autograph memorabilia market, such as Deedle, by agreeing not to do business with Deedle or by agreeing to fail the authenticity of all or a substantial percentage of Deedle's items based on the fact they came from Deedle and not on the actual authenticity of the item, all in violation of Section 1 of the Sherman Act, Section 1.

80.     As detailed herein, PSA/DNA, JSA, R &R Auctions, Epperson, Cyrkin, and Momentica have all joined together in a combination or conspiracy to restrain trade in the autograph memorabilia market to enhance their own positions in the market as authenticators, dealers, and consignors by reducing the number of authentic items on the market and illegally driving out legitimate competition, such as Deedle, all in violation of Section 1 of the Sherman Act.

81.     Section 4 of the Clayton Act provides that "... any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

82.     As a direct and proximate result of the aforesaid combination or conspiracy among PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica, and the actions taken pursuant thereto, Deedle has been injured in his business and property as follows: (a) Plaintiff has lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiff has been precluded from business growth that it otherwise would have achieved; and (c) Plaintiff has otherwise been injured in its business and property.

83.     As a result of these federal antitrust violations, Plaintiff is entitled to recover its actual damages in an amount exceeding $3,000,000, subject to proof at trial, multiplied by three, and the cost of suit, including a reasonable attorney's fee.

84.     In addition, Deedle requests any and all possible exemplary damages as determined by a jury after a trial against Defendants' for Defendants' egregious and malicious actions against Deedle's business.

///
///
///
///

24

### Second Cause of Action

### Intentional Interference with Prospective Economic Advantage

**(Against All Defendants)**

85.   Plaintiff alleges and incorporates each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

86.   Deedle has had numerous established business relationships with consumers in the sale of autographed memorabilia, including hundreds of loyal customers who had purchased approximately over $4,000,000 before the actions which took place as described herein.  Because of the nature of his customers, and the past dealings that Deedle had enjoyed with his customers, free from the cartel of PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica's actions, Deedle had a reasonable probability that such customers would continue to do business with him in the future.  In others words, such relationships would have led to potentially profitable contracts for sales of autographed memorabilia without the interference of the cartel failing the authentication of Deedle's autographed memorabilia without actually examining the items themselves.

87.   As indicated herein, Defendants, and each of them, engaged in wrongful conduct designed to disrupt Plaintiff's business relationships.  Those include, defaming Deedle's personal character and his business reputation.  Defendants also wrongfully opined to and affirmatively failed the authenticity of Deedle's items, not based on the actual authenticity of the items themselves, but on the fact that Deedle sold the items.

88.   Defendants, and each of them, failed the authenticity of Deedle's items on the basis that Deedle sold the items to intentionally and knowingly to deter customers from purchasing items from Deedle and having Deedle to have Deedle issue refunds for the items that were sold, thereby damaging Deedle's ability to freely and legitimately sell authentic items in the marketplace.

89.   As a direct and proximate result Defendants' actions, Deedle has been

injured in his business and property as follows: (a) Plaintiff has lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiff has been precluded from business growth that it otherwise would have achieved; and (c) Plaintiff has otherwise been injured in its business and property.

90.     As a result of Defendant's illegal and intentional interference with Deedle's business, Deedle has incurred actual damages in an amount that is ongoing and that has not yet been fully ascertained but which is at least $4,000,000 for the loss of sales to his customers and his loss of business that he would have made but for Defendants' actions.

91.     In addition, Deedle requests any and all possible exemplary damages as determined by a jury after a trial against Defendants' for Defendants' egregious and malicious actions against Deedle's business.

92.     Furthermore, Deedle requests all costs of court for bringing this claim.

### Third Cause of Action

### Violation of California Bus. & Prof. Code §17200

### (Against All Defendants)

93.     Plaintiff alleges and incorporates each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

94.     Business and Professions Code §17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

95.     As indicated herein, Defendants, and each of them, wrongfully opined to and affirmatively failed the authenticity of Deedle's items, not based on the actual authenticity of the items themselves, but on the fact that Deedle sold the items.

96.     Defendants, and each of them, failed the authenticity of Deedle's items on the basis that Deedle sold the items to intentionally and knowingly to deter customers from purchasing items from Deedle and having Deedle to have Deedle issue refunds for the items that were sold, thereby damaging Deedle's ability to freely and legitimately sell authentic items in the marketplace.

97.    Such actions are unlawful, unfair, and fraudulent business practices.

98.    As a direct and proximate result Defendants' actions, Deedle has been injured in his business and property as follows: (a) Plaintiff has lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiff has been precluded from business growth that it otherwise would have achieved; and (c) Plaintiff has otherwise been injured in its business and property.

99.    As a result of Defendant's unlawful, unfair, and fraudulent business practices with Deedle's business, Deedle has incurred actual damages in an amount that is ongoing and that has not yet been fully ascertained but which is at least $3,000,000.00 for the loss of sales to his customers and his loss of business that he would have made but for Defendants' actions.

100.  In addition, Deedle requests any and all possible exemplary damages as determined by a jury after a trial against Defendants' for Defendants' egregious and malicious actions against Deedle's business.

101.  Furthermore, Deedle requests all costs of court for bringing this claim.

[prayer for relief on following page]

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment and relief on the Complaint as follows:

1. All of Plaintiff's actual and consequential damages, which are believed to exceed $4,000,000;

2. Treble damages in accordance with the Clayton Act;

3. Exemplary damages as allowed by law;

4. For reasonable attorneys' fees on all applicable claims;

5. For costs of suit incurred herein; and

6. For such other and further relief as the Court may deem necessary or appropriate.


DATED: October 2, 2015                    CHRISTMAN, KELLEY & CLARKE, PC

                                                  /s/ Matthew Clarke
                                    By: _____
                                          Matthew M. Clarke
                                          Dugan P. Kelley
                                          Matthew N. Mong
                                          Attorneys for Plaintiffs


Plaintiffs demand trial by jury on causes of action so triable.

DATED: October 2, 2015                    CHRISTMAN, KELLEY & CLARKE, PC

                                                  /s/ Matthew Clarke
                                    By: _____
                                          Matthew M. Clarke
                                          Dugan P. Kelley
                                          Matthew N. Mong
                                          Attorneys for Plaintiffs